[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 5 2000
THOMAS K. KAHN
CLERK

_____

No. 98-5552

_____

D. C. Docket No. 95-CV-6798

NATIONAL UNION FIRE INSURANCE COMPANY,
OF PITTSBURGH, PENNSYLVANIA,

Plaintiff-Appellant,

versus

THE TRAVELERS INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(June 5, 2000)**

Before COX and DUBINA, Circuit Judges, and KRAVITCH, Senior Circuit
Judge.

KRAVITCH, Senior Circuit Judge:

In this appeal, we decide whether an excess insurer had a duty under Florida law, contractual or otherwise, to "drop down" and defend its insured prior to the cessation of the insured's right to defense under its primary insurance policy. We interpret Florida law to determine the duties of an excess insurer exclusively by the terms of the contract with its insured. Under the terms of the contract at issue, we conclude that the excess insurer was not obligated to "drop down" and defend its insured.

## I. BACKGROUND AND PROCEDURAL HISTORY

Palm-Aire Oceanside, Inc. ("Palm-Aire") franchised and operated the Palm-Aire Oceanside Resort (the "Resort") in Pompano Beach, Florida. Palm-Aire insured the Resort with two insurance policies: a primary insurance policy with a $1 million per occurrence limit purchased from Defendant-Appellee Travelers Insurance Co. ("Travelers") and an excess insurance policy purchased from Plaintiff-Appellant National Union Fire Insurance Co. ("National Union"). In 1990, Ryan Smith, a minor child, was seriously injured when he fell from a balcony at the Resort. The child's parents filed a negligence suit against Palm-Aire

2

and its franchiser Choice Hotels International, Inc. ("Choice Hotels")[1] in Florida state court (the "Florida litigation"); Choice Hotels cross-claimed against Palm-Aire for contribution and indemnity. Travelers, the primary insurer, defended Palm-Aire against all claims in the Florida litigation. Anticipating, however, that damages likely would exceed the limit of Palm-Aire's policy, Travelers, prior to the settlement of the Florida litigation, tendered the $1 million policy limit to National Union, the excess insurer, which was participating in the settlement negotiations.

While the Florida litigation was pending, Choice Hotels amended a complaint it previously had filed against Palm-Aire in a Maryland federal district court to recover overdue franchising fees and service charges. The amended complaint included a claim seeking indemnification for any losses incurred in connection with the Smith accident (the "Maryland litigation"). Palm-Aire requested that Travelers defend it against this additional claim in the Maryland litigation, but Travelers refused; Travelers explained to Palm-Aire that it was no longer obligated to provide a defense because, among other reasons, it already had tendered to National Union the primary policy's $1 million limit, which it expected to be exhausted fully in settlement of the Florida litigation. In the absence of any

---

[1]When this suit was filed, Quality Inns International, Inc. ("Quality Inns") was Palm-Aire's franchiser, but at some point subsequent, Choice Hotels purchased Quality Inns' franchise agreement with Palm-Aire and became Quality Inns' successor-in-interest.

defense, the district court entered a default order against Palm-Aire in the Maryland litigation. Eighteen months later, after the Florida litigation was settled for $5 million and the funds, including the $1 million contributed by Travelers, were paid to the plaintiffs, National Union actively began to defend Palm-Aire in the Maryland litigation. The district court, however, refused to vacate its default order and entered against Palm-Aire a default judgment of approximately $1.7 million, which was affirmed on appeal. See Choice Hotels Int'l, Inc. v. Palm-Aire Oceanside, Inc., 95 F.3d 41 (4th Cir. 1996). National Union paid $1.4 million of the default judgment, the amount of Choice Hotels' recovery on its indemnification claim.

To recover the amount of the default judgment and attorneys' fees and costs, National Union filed the instant action against Travelers in Florida federal district court. National Union alleged that Travelers had a duty to defend Palm-Aire in the Maryland litigation and that its breach of this duty precipitated the entry of the default judgment against Palm-Aire. National Union then moved for partial summary judgment to foreclose Travelers from asserting at trial that National Union had a concurrent duty to defend Palm-Aire in the Maryland litigation. The district court, however, interpreted Florida law to require an excess insurer, upon learning that its insured's primary policy is likely to exhaust prior to the conclusion

4

of pending litigation, to "drop down" and assist the primary insurer in defending the common insured. Because Travelers had introduced evidence revealing National Union's awareness of the likely exhaustion of Palm-Aire's primary policy, the district court denied National Union's motion for partial summary judgment. This interlocutory appeal followed.[2]

## II. ANALYSIS

### A. The Insurers' Respective Contractual Duties to Defend

Travelers, in its response to National Union's motion for partial summary judgment, contended that its obligation to defend Palm-Aire ended once it became clear that settlement of the Florida litigation would exhaust Palm-Aire's primary policy. Moreover, Travelers pointed out that prior to the commencement of the Maryland litigation, it tendered the full $1 million limit of the primary policy to National Union, which was participating in the negotiations to settle the Florida litigation. Tendering the funds, Travelers reasoned, was tantamount to paying them, thus exhausting the primary policy's coverage and extinguishing Travelers'

---

[2]The district court authorized an interlocutory appeal because "the substance of [National Union's] Motion for Partial Summary Judgment involves a controlling question of law as to which there is substantial ground for difference of opinion." Amended Order at 10, in R.4, Tab 71. The district court concluded that "[a]n immediate appeal may materially advance the ultimate determination of this litigation." Id.

further duty to defend. The district court rejected both arguments and found that Travelers's insurance contract with Palm-Aire required Travelers to continue to defend Palm-Aire in all litigation related to the accident until the policy limit was paid in the satisfaction of an actual judgment or settlement.[3]  Because the Maryland litigation arose before the Florida litigation was settled and the funds were disbursed to the plaintiffs, the district court held that Travelers had a continuing duty to defend Palm-Aire in the Maryland litigation. Travelers has not cross-appealed that holding; we therefore accept the district court's interpretation of Travelers' insurance contract with Palm-Aire and its ultimate conclusion concerning Travelers' duty to defend. Our analysis focuses exclusively on the district court's further holding that National Union had a concurrent duty to defend Palm-Aire in the Maryland litigation, a question of law we review *de novo*. See Royal Oak Landing Homeowner's Ass'n v. Pelletier, 620 So. 2d 786, 788 (Fla. 4th Dist. Ct. App. 1993) (per curiam).

In apportioning contractual responsibilities among multiple insurers, this court has recognized that "Florida law is quite clear that the parties' intent is to be measured solely by the language of the policies unless the language is ambiguous."

---

[3]Travelers' policy with Palm-Aire defines the scope of its duty to defend as follows: "Our right and duty to defend end when we have used up the applicable limit of insurance *in the payment of judgments or settlements . . . .*" Commercial General Liability Coverage Form at 1 (emphasis added), in R.2, Tab 12, Ex. 3.

Towne Realty, Inc. v. Safeco Ins. Co. of America, 854 F.2d 1264, 1267 (11th Cir. 1988) (emphasis in original omitted). We therefore consult the language of National Union's policy with Palm-Aire to determine whether it clearly defines the events that activate its coverage. Within a section entitled "Defense," the policy states:

> The provisions of this section apply solely to occurrences covered under this policy *but not covered by any underlying policies listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured*.

> This section shall also apply to occurrences *not covered by any underlying insurance* due to exhaustion of any aggregate limits by reason of any losses paid thereunder.

Commercial Umbrella Policy Form at 1 (emphasis added), in R.2, Tab 12, Ex. 4. The emphasized language unambiguously manifests National Union's intention that its policy only activate following the complete cessation of coverage under all underlying policies. We therefore are persuaded that National Union's duty to defend was consecutive to, rather than concurrent with, any other underlying insurer's duty to defend. Consequently, under the terms of National Union's policy, if the policy of any other insurer guarantees Palm-Aire a defense, National Union is not likewise obligated. Because the district court found that Palm-Aire was entitled to a continued right of defense under its primary policy with Travelers

7

at the time the Maryland litigation was initiated, we conclude that National

Union's contractual duty to defend had not yet been triggered.[4]

**B.     The Existence of an Equitable Duty to Defend**

Without reference to National Union's insurance contract with Palm-Aire,

the district court held that under Florida law, an excess insurer has a duty to

assume the defense of its insured once it becomes aware that the insured's liability

will exceed the limit of its primary policy.  The district court based its holding on

the following language from Aetna Casualty & Surety Co. v. Market Insurance

Co., 296 So. 2d 555, 558 (Fla. 3d Dist. Ct. App. 1974):

> National Car Rental Systems, Inc., being the primary
> insurer, had the primary duty to defend [the insured] up to
> the limit of its liability . . . . *When it became apparent that*
> *the liability would exceed this limit, then Market, as the*
> *"excess insurer," was obliged to take over the legal*
> *representation from National.*

(emphasis added).  Extrapolating from this language, the district court interpreted

Aetna Casualty to impose on an excess insurer an equitable duty that supercedes

even a contractual delegation of duties between parties.  Although we do not

---

[4]Contrary to Travelers' assertion, Travelers' refusal to defend the Maryland litigation did not trigger National Union's duty to defend.  Rather, under the terms of National Union's insurance contract with Palm-Aire, the continued existence of Travelers' contractual obligation to defend Palm-Aire forestalled the commencement of National Union's policy coverage, regardless of whether or not Travelers subjectively believed its duty was still active.

dispute that the excess insurer in <u>Aetna Casualty</u> had such a duty,[5] the district court's holding that this case created an equitable duty that extends to all excess insurers, regardless of the terms of their individual policies, directly contradicts the Florida Supreme Court's pronouncement that, "in the absence of an express statutory or contractual duty to defend, there is no such duty." <u>Allstate Ins. Co. v. RJT Enters.</u>, 692 So. 2d 142, 144 (Fla. 1997).[6]  Specifically, we iterate that whether or not an excess insurer is required to "drop down" and defend its insured depends solely on how that duty is defined by the terms of the excess insurance contract. <u>See, e.g.</u>, <u>Shapiro v. Associated Int'l Ins. Co.</u>, 899 F.2d 1116, 1123 (11th Cir. 1990) (applying Florida law and focusing only on the terms of the excess insurance policy in concluding that an excess insurer was not obligated to "drop down" and provide coverage for an insured, even though the primary insurer had become insolvent and the insured was left without a defense).  Neither the district court nor

---

[5]The <u>Aetna Casualty</u> court did not elaborate on the circumstances underlying its conclusion that the excess insurer was required to assume control of the insured's defense; indeed, the passage relied on by the district court merely recounted a factual situation that was not germane to the legal issue before the court.  Presumably, however, either (1) the excess policy mandated that its coverage commence once it became clear that the limits of the primary policy would exhaust during the pendency of litigation or (2) the excess policy was silent on when its coverage commenced, prompting the court to announce a default rule.

[6]We acknowledge that <u>RJT Enterprises</u> calls into question whether <u>Aetna Casualty</u> in fact announced a default rule.  We have no occasion to decide this issue, however, because, in the instant case, the excess insurance contract is not silent on the issue of when its coverage commences; its terms, therefore, control.

9

Travelers cites any apposite precedent in which an equitable duty to defend has been invoked to alter an excess insurer's contractually-defined duty to defend.[7] We therefore find no justification for burdening National Union with such an extracontractual duty.[8]

Alternatively, Travelers asserts that National Union tacitly assumed a duty to act in the best interest of Palm-Aire through its participation in the negotiations to settle the Florida litigation and its acceptance of Travelers' tender of the $1 million policy limit. Travelers does not allege that National Union neglected Palm-Aire's

---

[7]Travelers does cite several cases, largely from other jurisdictions, in which courts have held that excess insurers have a duty to "drop down" and defend their insureds when primary insurers, having concluded that their policies no longer provide coverage, decline to defend. See, e.g., Hocker v. New Hampshire Ins. Co., 922 F.2d 1476, 1480-83 (10th Cir. 1991) (applying Wyoming law); American Family Life Assurance Co. v. United States Fire Co., 885 F.2d 826, 832 (11th Cir. 1989) (applying Georgia law). These cases, however, do not support Travelers' assertion that an extracontractual duty exists; in fact, they support our holding that the duty of an excess insurer is determined exclusively by the terms of its insurance contract. See Hocker, 922 F.2d at 1482 ("The 'not covered, as warranted' language of [the] Insuring Agreement . . . establishes that [the excess insurer] must drop down for occurrences that are, in fact, covered by the underlying insurance policy despite the wrongful denial of coverage by [the primary insurer]."); American Family Life, 885 F.2d at 832 ("It is true that in the absence of a contractual obligation . . . the excess insurance carrier was not obligated to provide a defense. In this case, however, there was a provision in the insurance contract imposing such an obligation on [the excess insurer].") (internal citations omitted).

[8]We find no merit in Travelers' argument that our holding imperils insureds by creating the possibility that both their primary and excess insurers will deny coverage. In such a situation, an insured could bring suit against both insurers and allow a court to determine which had the duty to defend and which, therefore, should indemnify the insured for defense costs for having breached its duty. See generally North Amer. Van Lines, Inc. v. Lexington Ins. Co., 678 So. 2d 1325 (Fla. 4th Dist. Ct. App. 1996) (entertaining claims brought by insured against primary and excess insurers for breach of contract, bad faith, intentional interference, and conspiracy).

10

interests in settling the Florida litigation, but rather that a general duty of good faith required National Union to defend Palm-Aire in the Maryland litigation once Travelers refused to do so. Although we agree that an excess insurer, like any insurer, owes its insured a duty of good faith when resolving claims, see Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980), this duty simply requires an insurer to act in the best interest of its insured in the performance of its *contractual* duties. National Union, realizing that the settlement of the Florida litigation likely would exceed the limits of Palm-Aire's primary policy, agreed to participate in the negotiations. Thus, National Union's inevitable duty to indemnify, a duty distinct from its duty to defend, see RJT Enters., 692 So. 2d at 142, motivated its involvement in the negotiations to settle the Florida litigation. Once involved, National Union was required to exercise good faith in negotiating a settlement on behalf of Palm-Aire, but its voluntary participation neither relieved Travelers of its contractual duty to defend, nor imposed on National Union an extracontractual duty to defend, a separate, albeit related, lawsuit.

## II. CONCLUSION

11

We REVERSE the district court's denial of National Union's motion for partial summary judgment and REMAND the case for further proceedings consistent with this opinion.